UNITED STATES of America, Appellee,

v.

Donald Edward RAMEY, Appellant.

No. 82–2388.

United States Court of Appeals,
Eighth Circuit.

Submitted May 17, 1983.

Decided July 7, 1983.

Rodney S. Webb, U.S. Atty., Charles S. Miller, Jr., Asst. U.S. Atty., Bismarck, N.D., for appellee.

Russell J. Myhre, Bismarck, N.D., for appellant.

Before LAY, Chief Judge, and HEANEY and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

Donald Edward Ramey appeals from his conviction for involuntary manslaughter in violation of 18 U.S.C. §§ 1112(b) and 1153 (1976). Defendant was the driver of a car that struck the rear of a payloader on a Bureau of Indian Affairs road leading into Fort Yates, North Dakota. A passenger in the car, George Kevin Keeps Eagle, Jr., died as a result of injuries he sustained in the accident. The sole issue in this appeal is whether the trial court erred in refusing to suppress the results of a blood alcohol test administered shortly after the accident, while the defendant was being treated at the Public Health Service Hospital in Fort Yates. Because the district court's finding that the defendant consented to the taking of the blood sample is not clearly erroneous, we affirm.

## I. BACKGROUND

On February 8, 1982, at approximately 6:40 p.m., Ramey and Keeps Eagle were traveling east on a road leading into Fort Yates when their vehicle crashed into a slower moving front end payloader, which also was traveling eastbound into Fort Yates. Officer Little Dog of the Bureau of Indian Affairs (BIA) Police was traveling in the westbound lane of the road, and had just begun to turn around in an attempt to stop the defendant's vehicle for speeding when the accident occurred. It was dusk at the time, and there was some evidence that the payloader's taillights had not been on prior to the collision.

Immediately after the accident, Officer Little Dog's first concern was to get Ramey and his passenger Keeps Eagle to the hospital for treatment. Little Dog knew both men because they were fellow BIA employees: the defendant was a BIA police officer and Keeps Eagle was a BIA dispatcher and jailer. When Little Dog was unable to open the doors on the defendant's car, he called for assistance and an ambulance. Police began an investigation of the accident after the defendant and Keeps Eagle were taken to the hospital. They found empty beer bottles on the front floorboards of the defendant's vehicle and Officer James Molash, who had been called to the scene, smelled the odor of alcohol in the car.

At the hospital, Ramey was placed in the emergency room on a stretcher while doctors tried to resuscitate Keeps Eagle. When these attempts proved unsuccessful, their attention turned to the defendant, who was less seriously injured. The defendant was first taken to the x-ray room for x-rays by laboratory technician Gertrude Alice Nale. Nale testified that, in her opinion, the defendant was drunk and uncooperative, and she stated that she detected a strong smell of alcohol on his

breath. BIA Officer Fool Bear also observed the defendant in the x-ray room and testified that he too smelled the odor of alcohol on the defendant.

After the x-rays were taken, Nale moved Ramey to another room to be examined by Dr. Lynn Standsbury. Prior to the examination, Standsbury had received a call from Officer Molash, who requested that the hospital take a blood sample from Ramey for police purposes. Molash testified that he wanted the blood sample once he learned that a death had occurred as a result of the accident. Molash knew that the Public Health Service Hospital had a policy of refusing to draw blood from an Indian without his or her consent if the blood was to be used against the Indian, so he also called FBI Agent Bill Willis to inform him that a warrant might be required to obtain a blood sample. Officer Fool Bear talked with Dr. Standsbury at the hospital about obtaining a blood sample as well. When Standsbury stated that the defendant might not want to give one, Fool Bear indicated that he would attempt to obtain a warrant if Ramey did not consent to the taking of the sample.

Dr. Standsbury's first attempts to examine Ramey were not successful. Ramey refused to cooperate and pulled out an IV that had been partially started. After the doctor and members of Ramey's family urged him to cooperate, however, Ramey did permit the doctor to examine him. Following the examination, the doctor asked Nale, the lab technician, to draw some blood for medical purposes. Dr. Standsbury also indicated that the BIA Police had requested an extra vial of blood. Nale left the examining room to get the necessary equipment; and when she returned, she heard the defendant say, "I suppose the so-and-so's want to know how drunk I am." Nale did not respond to this comment, but she took the defendant's arm, washed it with iodine, and took the blood needed for both the police and the medical tests which the doctor had requested. A vial was given to the BIA Police, who subsequently had the blood analyzed by the North Dakota State Toxicologist's office. The sample disclosed a serum-alcohol concentration of .26 percent, which is the equivalent of a blood alcohol concentration of .22 percent.

## II. MOTION TO SUPPRESS

The defendant was indicted by a grand jury for manslaughter on April 21, 1982. Prior to trial, the defendant moved to suppress the results of the blood alcohol test that had been performed by the state toxicologist's office. A hearing was held on July 8, 1982. The five witnesses who testified were Officer Little Dog, Officer Fool Bear, Officer Molash, Gertrude Nale, and Rose Ramey, the defendant's wife. A number of facts were stipulated. Both parties agreed that the blood sample was taken without a warrant when the defendant was not under arrest. In addition, both parties agreed that the defendant was hospitalized and under treatment at the time the sample was taken and that there were exigent circumstances involved because the alcohol content of the blood was dissipating over time.

At the conclusion of the suppression hearing, the trial court issued an oral ruling denying the defendant's motion to suppress the results of the blood test. On July 9, 1982, the court issued an order confirming this denial. The court held that the taking of the blood did not violate the defendant's constitutional rights because there was probable cause, the blood sample was a very limited intrusion incident to Ramey's hospitalization for medical treatment, and the blood alcohol evidence was in danger of immediate destruction. Thus the court determined that under the Supreme Court's decision in *Cupp v. Murphy,* 412 U.S. 291, 296, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900 (1973), the evidence was obtained in a constitutional manner. The court also held that the defendant knowingly consented to the giving of the blood sample.

On appeal, the defendant argues that the trial court erred in failing to suppress the evidence. Because we find no clear error in the court's finding that the defendant voluntarily consented to the giving of the blood sample, we need not reach the other

arguments raised by the defendant in this appeal.[1]

### III. CONSENT

A search that is conducted pursuant to a valid consent does not violate the Constitution. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *United States v. Matthews,* 603 F.2d 48, 51 (8th Cir.1979), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 650 (1980). The government bears the burden of proving by a preponderance of the evidence that the defendant's consent was freely and voluntarily given. *United States v. Selberg,* 630 F.2d 1292, 1294 (8th Cir.1980); *United States v. Matthews, supra,* 603 F.2d at 51. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. at 2047; *United States v. Leichtling,* 684 F.2d 553, 556 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983). We must uphold the district court's finding of consent in this case unless it is clearly erroneous. *United States v. Leichtling, supra,* 684 F.2d at 556; *United States v. Allison,* 619 F.2d 1254, 1262 (8th Cir. 1980).

The defendant argues that he never consented to the taking of the blood sample, and that at most his actions amounted to a capitulation to authority. Upon a review of all of the circumstances, however, we cannot say that the district court clearly erred when it found that the defendant voluntarily consented. The defendant was a BIA police officer. He had been in an accident and appeared to be under the influence of alcohol, but he was aware of what was happening and appreciated the significance of the taking of the blood sample. His statement to the effect that, "I suppose the so-and-so's want to know how drunk I am," demonstrates his understanding of the situation. Moreover, the doctor had previously stated that "[t]he police have requested that we draw an extra tube," and the district court credited the testimony of Ms. Nale, the laboratory technician, that Ramey consented to the taking of the sample for that purpose. Nale testified that Ramey was not asleep or unconscious at any time during the examination or the taking of the blood sample, and that he consented to the taking of the blood by "[h]olding out his arm and watching me clean it. He works for Law and Order. He knew what I was doing and why I had to clean it that way."[2]

Ramey's wife, Rose, testified that she was with the defendant when his blood was taken. She stated that his eyes were closed and when Nale put the needle in his arm, he simply asked, "Ma'am, what are you doing?" She testified that she did not hear Ramey comment on the police wanting to "find out how drunk" he was, but she indicated that Ramey did allow the sample to be taken. The defendant argues on appeal that his wife's testimony, coupled with Nale's testimony that the doctor had previously told him that he would be taken to jail if he did not cooperate, prove that he was coerced into giving the sample. The doctor's statement was made when the defendant initially refused to cooperate in any way with an examination. Members of his family then tried to convince him to let the doctor treat him, which he finally agreed to do. Thus, the statement was not directly connected with the taking of the blood sample for police.

Nevertheless, we agree that these circumstances present a factual issue as to whether the defendant voluntarily consented to the taking of the blood sample for police purposes. The district court resolved this factual question, however, after listening to

---

1. Specifically, we need not reach the issue of whether the blood alcohol evidence should have been suppressed because the defendant was not under arrest at the time the sample was taken. *See United States v. Harvey,* 701 F.2d 800 (9th Cir.1983).

2. Nale testified that a special procedure had to be used when blood samples were taken for blood-alcohol tests to avoid using anything with alcohol in it to clean the arm.

all the testimony and judging the credibility of the witnesses, by crediting Ms. Nale's statements concerning Ramey's actions. In view of all of the circumstances, particularly the fact that the defendant was a police officer who was familiar with police procedures and who knew the purpose for the blood test in this case, we cannot say that the district court erred in holding that the defendant consented to the taking of the blood sample.

Accordingly, the judgment of the district court is affirmed.